**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| YONGBIN GU, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **Case No.** |
| Plaintiff, | ) ) |
| v. | ) **CLASS ACTION COMPLAINT** ) |
| CELADON GROUP, INC., BOBBY L. PEAVLER, and PAUL A. WILL | ) **JURY TRIAL DEMANDED** ) |
| Defendants. | ) ) ) |

**CLASS ACTION COMPLAINT**

Plaintiff Yongbin Gu ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Celadon Group, Inc. ("Celadon" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Celadon securities between January 27, 2016 and May 1, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Celadon, through its subsidiaries, provides long-haul, full-truckload freight service across the United States, Canada, and Mexico. The Company also provides supply chain management solutions such as warehousing and dedicated fleet services, as well as freight brokerage services.

3.      Founded in 1985, the Company is headquartered in Indianapolis, Indiana. Celadon's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CGI."

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Celadon's equity contribution to its joint venture with Element Financial Corp. was $68.2 million, rather than the $100 million contribution the Company reported in its public filings; (ii) the Company is being actively investigated by the SEC; (iii) Celadon had errors in previously reported consolidated financial statements related to its accounting of transactions involving dispositions and acquisitions of revenue equipment; (iv) in turn, the Company lacked effective internal controls over financial reporting; and (v) as a result of the foregoing, Celadon's public statements were materially false and misleading at all relevant times.

2

5.     On April 5, 2017, the market research website *Seeking Alpha* published a detailed report authored by a Prescience Point Research Group, entitled "Celadon Group: A Story That Ends At Chapter 11," which, among other things, alleged that "CGI has used .... manipulative accounting practices to hide its insolvent condition from investors and creditors."

6.     On this news, Celadon's share price fell $0.85, or 13.6%, to close at $5.40 on April 5, 2017.

7.     On April 19, 2017, the same prominent market research group published another report entitled "FOIA Requests Reveal CGI as the Subject of an Active SEC Investigation," which reported that the research group was denied information about Celadon sought under the Freedom of Information Act ("FOIA") due to an ongoing SEC investigation.

8.     On this news, Celadon's share price fell $0.20 or 4.55%, to close at $4.20 on April 19, 2017.

9.     On May 1, 2017, post-market, Celadon issued a Current Report filed on Form 8-K in the SEC, stating that "the Company's financial statements for the fiscal year ended June 30, 2016 and quarters ended September 30 and December 31, 2016, and related reports of [Celadon's auditor], should not be relied upon." The Current Report, stated in relevant part:

> **Item 4.02 Non-Reliance on Previously Issued Statements or a Related Audit Report or Completed Interim Review.**
>
> (a) and (b) ***On April 25, 2017, BKD, LLP ("BKD"), the independent auditors for the Company, informed the chair of the Audit Committee of the Company's Board of Directors (the "Audit Committee") that it was withdrawing its reports on the June 30, 2016, September 30, 2016, and December 31, 2016 financial statements of the Company, and that those reports should no longer be relied upon.*** BKD advised the Company that additional information relating to transactions involving revenue equipment held for sale had come to BKD's attention subsequent to BKD's issuance of its audit report on the Company's June 30, 2016 financial statements and after the issuance of BKD's review reports on the Company's September 30, 2016 and December 31, 2016 interim financial statements. BKD further advised the Company that, in accordance with PCAOB Auditing Standard 2905, BKD had performed procedures to evaluate this

information, including requesting explanations and supporting documentation from the Company's management. Based on the results of BKD's procedures, BKD advised the Company that BKD has been unable to obtain sufficient appropriate audit evidence to provide a reasonable basis to support its previously issued reports for the periods indicated above. ***As a result, as of May 1, 2017, the Audit Committee has concluded that the Company's financial statements for the fiscal year ended June 30, 2016 and quarters ended September 30 and December 31, 2016, and related reports of BKD, should not be relied upon.***

The Audit Committee has discussed with BKD the matters disclosed under this Item 4.02. Based on these discussions, the Company understands the following: (i) BKD has not resigned as the Company's auditor; (ii) BKD has determined that it has not obtained sufficient appropriate audit evidence with respect to the revenue equipment held for sale transactions to determine that those transactions were properly recorded in accordance with GAAP; and (iii) BKD is prepared to review additional information, if any, and adjustments to the Company's financial statements, if any, and to then consider whether to re-issue the withdrawn reports.

***The insufficient appropriate audit evidence relates to the accounting (and related structure, substance, and disclosure) of transactions involving dispositions and acquisitions of revenue equipment between June and December of 2016 and the related carrying values.*** Additional information concerning the transactions and the fair values of the revenue equipment disposed of and acquired is required to determine the appropriateness of the accounting for these transactions. The need for additional information followed an Audit Committee request of BKD to perform additional procedures on the transactions prior to the normal audit cycle for fiscal 2017.

The Company has provided BKD a copy of this Form 8-K and requested BKD to furnish a letter addressed to the Securities and Exchange Commission stating whether it agrees with the statements made in Item 4.02 of this Form 8-K, and, if not, stating the respects in which it does not agree. The Company has requested that BKD provide such letter as soon as possible, so that the Company can file such letter as an Exhibit to this Current Report on an amended Form 8-K within the time period prescribed by the Securities and Exchange Commission.

(Emphasis added.)

10.     On this news, Celadon's share price fell $2.20, or 55%, to close at $1.80 on May 2, 2017.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

4

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

14.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Celadon's shares trade on the NYSE, which is located within this Judicial District.

15.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.     Plaintiff, as set forth in the attached Certification, acquired Celadon securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.     Defendant Celadon is incorporated in Delaware. The Company's principal executive offices are located at 9503 East 33rd Street, One Celadon Drive, Indianapolis, Indiana. Celadon's shares trade on the NYSE under the ticker symbol "CGI."

18.     Defendant Bobby L. Peavler ("Peavler") has served at all relevant times as the Company's Chief Financial Officer, Executive Vice President and Treasurer.

19.     Defendant Paul A. Will ("Will") has served at all relevant times as the Company's Chief Executive Officer.

20.     The Defendants referenced above in ¶¶ 18-19 are sometimes referred to herein collectively as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Celadon operates through various subsidiaries, including Quality Companies, LLC, Quality Equipment Leasing, LLC (the "Quality Companies") which together offer lease purchase programs for tractors, used trailer sales, and new equipment leasing for fleets.

22.     In March of 2014, Celadon entered into a transaction with non-Celadon entity, Element Financial Corp. ("Element"), under which Element purchased Celadon's portfolio of independent contractor leases (which included leasing a tractor from Celadon through the Quality Companies) and directly provided financing to Celadon's independent contractors. The portfolio was held in Celadon's Quality Companies business unit.

23.     Under Celadon's agreement with Element, Celadon was required to service the equipment lease and other financing arrangements between independent contractor drivers and Element, which includes collecting payments from the independent contractors and remitting those payments to Element.

24.     The agreement also included an arrangement under which Celadon was obligated to advance to Element any shortfall between the required lease payments and the maintenance advances and amounts actually collected from the independent contractors (the "Lease Shortfall Advances").

25.     Element was obliged to reimburse Celadon for the Lease Shortfall Advances when they disposed of the entire tranche of tractors to which the shortfall related.

26.     In Celadon's full year 2016 financial report, filed on Form 10-K with the SEC on September 13, 2016, the Company explained that the "demand for trucking services and the market for used tractors have both weakened" and that "[t]hese factors have depressed Quality's earnings and created negative cash flows associated with our obligation to advance certain amounts to [Element]." Put simply, Celadon was hemorrhaging money as a result of its Lease Shortfall Advance obligations.

27.     In the same 10-K filing, the Company announced that it had signed an MOU with Element "under which substantially all of Quality's tractors under management owned by such third party financing provider, 19th Capital [which in 2015 purchased a portfolio of the Quality Companies' independent contractor leases], and Quality would be combined into 19th Capital as a joint venture" (the "Joint Venture"). The Company further explained that existing agreements with Element would be terminated and replaced with definitive agreements contemplated by the MOU.

**<u>Materially False and Misleading Statements Issued During the Class Period</u>**

28.     The Class Period begins on January 27, 2016, when Celadon issued a press release entitled "Celadon Group Reports December Quarter Results and Declares Dividend," summarizing the Company's financial and operating results for the period ended December 31, 2015. In part, CGI reported $49,298,000 in "Leased revenue equipment held for sale" and $81,016,000 in "Revenue equipment held for sale" under its "current assets."

29.     On February 9, 2016, Celadon filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended December 31, 2015 (the "Q2 2016 10-Q"). The Q2 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2

2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

30.    In the Q2 2016 10-Q, the Company stated, in relevant part:

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the "Certifying Officers"), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating our controls and procedures.

We have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report, as required by Rule 13a-15 and 15d-15 under the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including the Certifying Officers. ***Based upon that evaluation, our Certifying Officers concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.***

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting that occurred during the most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

31.    On May 10, 2016, Celadon filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q3 2016 10-Q"). The Q3 2016 10-Q contained signed certifications pursuant to SOX by

the Individual Defendants, stating that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

32.    In the Q3 2016 10-Q, the Company stated, in relevant part:

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the "Certifying Officers"), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating our controls and procedures.

We have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report, as required by Rule 13a-15 and 15d-15 under the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including the Certifying Officers. ***Based upon that evaluation, our Certifying Officers concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.***

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting that occurred during the most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

33.    On September 13, 2016, Celadon filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year

ended June 30, 2016 (the "2016 10-K"). The 2016 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

34.    In the 2016 10-K, the Company stated, in relevant part:

**EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Securities Exchange Act of 1934, as amended (the Exchange Act), is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the Certifying Officers), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating our controls and procedures.

***Based upon that Evaluation, our Certifying Officers have concluded that, as of June 30, 2016, the Company's disclosure controls and procedures are effective.***

\*\*\*

**CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING**

The Company's management, including the Company's Chief Executive Officer and its Chief Financial Officer regularly review our disclosure controls and procedures and make changes intended to ensure the quality of our financial reporting. There were no changes in our internal control over financial reporting that occurred during the most recently completed fiscal year that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

35.    On November 9, 2016, Celadon filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September

30, 2016 (the "Q1 2017 10-Q"). The Q1 2017 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2017 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

36.    In the Q1 2017 10-Q, the Company stated, in relevant part:

**Item 4.    Controls and Procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the "Certifying Officers"), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating our controls and procedures.

We have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report, as required by Rule 13a-15 and 15d-15 under the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including the Certifying Officers. ***Based upon that evaluation, our Certifying Officers concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.***

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting that occurred during the period covered by this report that have materially affected or that are reasonably likely to materially affect our internal control over financial reporting.

(Emphasis added.)

37.    On December 30, 2016, Celadon issued a press release entitled "Celadon Group Announces Closing of Joint Venture with Element Fleet Management," in which Celadon,

among other things, touted its $100 million investment in its newly- created joint venture with

Element. The press release stated, in pertinent part:

> INDIANAPOLIS, Dec. 30, 2016 /PRNewswire/ -- Celadon Group, Inc. (NYSE: CGI) ("Celadon") announced today that it has entered into a joint venture agreement with Element Transportation LLC ("Element"), a subsidiary of Element Fleet Management (TSX: EFN). The joint venture will hold leasing assets managed by Celadon's Quality Companies, LLC business unit ("Quality") and formerly held by a combination of Celadon (including, Element, and 19th Capital Group, LLC ("19th Capital"), a Delaware limited liability company.

> **Company Statement**

> Chairman and Chief Executive Officer Paul Will commented: "We are very pleased to announce the closing of our previously announced joint venture transaction with Element. Since August, we have been working diligently with the Element team to structure a high quality, well-capitalized business that will provide excellent transportation assets and high quality service to our customers. With the interests and investments of Element and Celadon strongly aligned, an experienced management team, and the resources to optimize leasing assets, the joint venture has the components for success. The support and business acumen of the Element team were instrumental to the process, and we appreciate their partnership.

> "In addition to capitalizing a strong joint venture, the transactions furthered Celadon's goals of exiting the capital intensive component of the leasing business, reducing balance sheet debt, and converting our Quality Companies unit primarily to an asset light business. We believe the transaction has multiple benefits for our stockholders and are excited to be able to focus our resources on the trucking side of the business."

> "We have built a long-term relationship with Celadon, and we are excited to deepen our partnership," stated Bradley Nullmeyer, Chief Executive Officer of Element. "This joint venture expands Element's position in the Class 8 tractor sector and provides a great opportunity to broaden our range of fleet services across a larger market, with a great partner."

> **About the Joint Venture**

> The joint venture represents the combination of the former equipment leasing portfolios of Celadon, Element, and 19th Capital that were managed by Quality. The joint venture holds over 10,000 tractors for use in leasing operations, with a business plan focused on leasing to trucking fleets. The joint venture is considered to be one of the leading lessors to this market, with an augmented and experienced management team that is focused on driving excellence throughout the business.

The joint venture was formed through recapitalizing 19th Capital. The former owners of 19th Capital (including Celadon's former Class A and Class B interests) were redeemed using pre-transaction cash of 19th Capital, and new equity was contributed by Celadon and Element to establish the post-transaction capitalization. Celadon's contribution includes cash and lease equipment totaling $100 million in value in exchange for its equity in the joint venture. The cash component was more than offset by proceeds of redemption, settlement of the deferred purchase price on assets sold to 19th Capital in FY2016, and collection of an amount relating to the terminated pre-joint venture arrangements. After the contributions, each of Celadon and Element own approximately 49.99% of the joint venture's equity, with employees of 19th Capital holding the remainder.

As part of the transaction, all previous agreements between Celadon, Element, 19th Capital, and their respective affiliates, have been terminated or assumed by the joint venture with no liability of Celadon. Quality has entered into a new Service Agreement with the joint venture and will provide leasing management services in exchange for a monthly fee per tractor.

**Additional Information**

In addition to closing the joint venture, Celadon received approximately $50 million in cash proceeds from the sale of equipment associated with the Quality business at net book value for use by the joint venture. This sale and the equity contribution of equipment substantially reduced the Company's equipment held for sale, leased assets held for sale, and leased assets. The Company will file a Form 8-K containing additional information within the required timeframe.

38.    On January 6, 2017, the Company filed a Form 8-K with the SEC further detailing the Joint Venture and its contributions thereto, including that the company had contributed a $31.8 million cash reimbursement of Lease Shortfall Advances received from Element, among other things:

The Company (i) contributed $35.3 million in cash to 19th Capital, (ii) conveyed to 19th Capital equipment (primarily tractors) categorized as equipment held for sale, leasing assets held for sale, or leasing assets used with a net book value of $63.6 million, and (iii) received credit for $1.1 million of unencumbered cash in the bank accounts of 19th Capital immediately at the consummation of the Transaction. In consideration of the foregoing, 19th Capital (i) issued to the Company membership units of 19th Capital, which, after the consummation of the Transactions, constituted approximately 49.99% of the issued and outstanding units of 19th Capital, (ii) paid to the Company $31.8 million in cash for reimbursement of previous payments made by the Company related to the Element assets, and (iii) issued the Company an obligation to distribute restricted cash of 19th Capital and its subsidiaries at the closing of the Transactions of

13

approximately $2.5 million at such time as such cash becomes unrestricted. Going forward, the Company has agreed not to enter into additional leases as lessor in the equipment leasing business, subject to a modest exception for short-term leasing pending ordinary course dispositions from the Company's trucking fleet.

***

### Summary of Cash Sources and Uses

The following table summarizes the Company's primary sources and uses of cash associated with the Transactions (excluding taxes, fees, and expenses):

| Source / (Use) (in millions) | Description |
|---:|---|
| $   4,600 | Cash received – redemption |
| 6,700 | Cash received – receipt of deferred purchase price cash |
| 50,000 | Cash received – sale of Quality equipment |
| 31,800 | Cash received – reimbursement of Other Assets |
| (35,300) | Cash invested in 19th Capital at closing |
| $  57,800 | Net cash received at closing |

The foregoing excludes other sources and uses of cash during the quarter and should not be considered a substitute for the Company's net changes in cash during the quarter.

### Summary of Equipment Transactions

The following table summarizes the Company's total contribution to 19th Capital at closing, including equipment dispositions associated with the Transactions:

| Source/(Use In Millions) | Description |
|---:|---|
| $   56,000 | Equipment contributed to 19th Capital at closing |
| 21,900 | Contribution of deferred sale assets from 9/30/2016 |
| 50,000 | Equipment sold to Element at closing |
| 34,600 | Settlement of deferred sale assets from 6/30/2016 |
| $  162,500 | Total equipment reduction at closing |
| | |
| $   14,300 | Contribution of deferred sale liability from 9/30/2016 |
| 26,000 | Settlement of deferred sale liability from 6/30/2016 |
| $  40,300 | Total reduction in liabilities at closing |
| | |
| $   77,900 | Equipment contributed to 19th Capital at closing |
| (14,300) | Other liabilities related to contributed deferred sales assets |
| 35,300 | Cash contributed to 19th Capital |
| 1,100 | Undistributed cash remaining with 19th Capital |
| $  100,000 | Total contribution to 19th Capital at closing |

14

39.    On February 10, 2017, Celadon filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended December 31, 2016 (the "Q2 2017 10-Q").  In the Q2 2017 10-Q, prominently touted the Company's collection of $31.8 million in Lease Shortfall Advances from Element and in-turn contribution of that money to the Joint Venture:

**Non-Controlling Investment**

In December 2016, the Company, Quality Companies LLC, a wholly-owned subsidiary of the Company ("Quality"), Quality Equipment Leasing, LLC, a wholly-owned subsidiary of the Company ("Leasing"), 19th Capital Group, LLC, a non-controlling investment of the Company before and after the transactions described below ("19th Capital"), Element Transportation LLC ("Element"), and certain other parties entered into a series of simultaneous agreements and related transactions (collectively, the "Transactions"), pursuant to which substantially all tractors under management by Quality and owned by Element, 19th Capital, Quality, and Leasing have been combined into 19th Capital as a joint venture primarily between the Company and Element. After the Transactions, the Company and Element each own a non-controlling approximately 49.99% interest in 19th Capital, which at December 31, 2016, held the rights to over 10,000 tractors for use in leasing operations. The Company recorded $100.0 million as a minority investment and will record operating results of the joint venture using the equity method of accounting. The Transactions included the following:

- *Redemption of Existing Members*: 19th Capital redeemed all of its issued and outstanding membership interests, including those owned by the Company, for $15.7 million in cash. The Company's proceeds from the redemption were approximately $4.6 million in cash. The proceeds received relate primarily to the original $2.0 million that had been invested by the Company in 2015 and its proportionate share of undistributed earnings from inception. The Company recorded a net gain on the redemption of approximately $0.3 million, reflecting the excess of redemption proceeds over the initial investment plus equity income profits previously recognized. In addition to the redemption amount, the Company is entitled to receive approximately $2.5 million in restricted cash when the restrictions lapse. The Company has evaluated this receivable under ASC 450 – Contingencies and has not recorded a receivable within our financial statements at this time. If and when collected, this amount would be recorded as income.

- *Deferred Sale with 19th Capital*: As part of the Transactions the Company received proceeds of $6.7 million in payment of deferred purchase price

15

from a sale of equipment to 19th Capital in the June 30, 2016 quarter. This collection triggered sales accounting treatment for leased assets where recognition of the sale was deferred and leased assets remained on the Company's balance sheet. As a result, the Company removed $34.6 million of "Leased assets" and $26.0 million of liabilities recorded within "Lease servicing liabilities" and "Other long term liabilities". The Company did not recognize any gain or loss with this transaction.

- *Sale to Element*: The Company sold tractors and trailers and assigned the related leases to Element for approximately $50.0 million. There was no material gain or loss on the disposition of this equipment.

- ***Receipt of Lease Servicing Advance ("Perfect Pay"): The Company received $31.8 million in cash related to a receivable from Element related to the Company's Perfect Pay obligations under the prior service agreements with Element.***

- *Contribution by the Company:* The Company (i) contributed $35.3 million in cash to 19th Capital, (ii) conveyed to 19th Capital equipment (primarily tractors) categorized as equipment held for sale, leasing assets held for sale, or leasing assets used, with a net book value of $56.0 million, (iii) received credit for $1.1 million of amounts owed to the Company by 19th Capital and (iv) contributed $7.6 million of the remaining consideration due from 19th Capital related to a September 30, 2016 deferred sale transaction with 19th Capital that was previously recorded as a financing transaction under GAAP. The contribution of the $7.6 million resulted in the removal of "Leased assets" of $21.9 million and $14.3 million of liabilities recorded within "Lease servicing liabilities" and "Other long term liabilities". In consideration of the foregoing, 19th Capital (i) issued to the Company membership units of 19th Capital, which, after the consummation of the Transactions, constituted approximately 49.99% of the issued and outstanding units of 19th Capital.

- *Summary of Transactions*: The following table summarizes the Company's total contribution to 19th Capital at closing (in thousands):

| Contribution | Description |
|---|---|
| $   56,000 | Equipment contributed to 19th Capital at closing |
| 7,600 | Contribution of deferred sale receivable |
| 35,300 | Cash contributed to 19th Capital |
| 1,100 | Receivable due from 19th Capital |
| $  100,000 | Total contribution to 19th Capital at closing |

***

**Cash Flows**

***Net cash provided by operations for the six months ended December 31, 2016 was $58.5 million, compared to $22.9 million for the six months ended December 31, 2015. The increase reflected several items related to the closing of our joint venture in December 2016 and related equipment transactions during the period. These items include, $31.8 million in collection of cash payment recorded under other assets***, distributions received on earnings from an unconsolidated entity of $2.6 million, and a $16.9 million reduction in leased revenue equipment held for sale. Excluding these amounts, net cash flow provided by operations was $7.2 million for the six months ended December 31, 2016. Leased revenue equipment held for sale reflects $82.1 million of sales less $65.2 million of purchases for the six months ended December 31, 2016. These purchases relate solely to equipment for the benefit of our equipment leasing and services segment which activities will be undertaken through 19th Capital moving forward. Leased revenue equipment held for sale was zero at December 31, 2016. Purchases and sales of used Celadon fleet equipment are included within our net cash provided by investing activities.

(Emphasis added.)

40.     In the Q2 2017 10-Q, Celadon also assured investors of the effectiveness of the Company's internal controls over financial reporting, stating in relevant part:

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the "Certifying Officers"), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating our controls and procedures.

We have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report, as required by Rule 13a-15 and 15d-15 under the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including the Certifying Officers. Based upon

that evaluation, our Certifying Officers concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

41.     The Q2 2017 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2017 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

42.     The statements referenced in ¶¶ 28-41 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Celadon's equity contribution to its joint venture with Element Financial Corp. was $68.2 million, rather than the $100 million contribution the Company reported in its public filings; (ii) the Company is being actively investigated by the SEC; (iii) Celadon had errors in previously reported consolidated financial statements related to its accounting of transactions involving dispositions and acquisitions of revenue equipment; (iv) in turn, the Company lacked effective internal controls over financial reporting; and (v) as a result of the foregoing, Celadon's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

43.     On April 5, 2017, *Prescience Point Research Group* published a report alleging that the Company overstated its investment in the Joint Venture by $31.8 million, stating in relevant part:

**CGI Lied RE Collecting on its $31.8m Shortfall Receivable. Is this the Smoking Gun that it's Falsifying its Financials?**

Given that the Lease Shortfall Advances were a significant reason that cash flow had turned negative, investors were obviously concerned about these payments. CGI had highlighted that its JV arrangement would not require continued Lease

Shortfall Advances.[3] 8-K from 01/06/2017: "The new Service Agreement does not contain any payment remitting, "Perfect Pay" or similar obligation"

Furthermore, CGI prominently highlighted in its Q2'17 earnings release filed on 2/01/2017 that it collected $31.8m of prior Lease Shortfall Advances from Element. Unfortunately, based on information provided in the JV subscription agreement, it appears that **CGI never actually collected its Lease Shortfall Advances. CGI received a sham daylight loan from the JV:** In the subscription agreement, CGI disclosed that Element provided a "daylight loan" of $31.8m to the JV, the JV then gave the $31.8m to CGI, and then CGI paid the $31.8m back to the JV to pay off the outstanding contribution from Element. What essentially happened is Element gave CGI $31.8m and then CGI handed that $31.8m right back to Element (with the JV as an intermediary). The circular transaction created the illusion that CGI collected it Lease Shortfall Advances and made a $31.8m contribution to the JV, but this is just accounting gimmicks. No value was ever created or contributed to the JV.



The specific details of the Lease Shortfall Advance and related daylight loans are detailed below.

**Element required to repay the Lease Shortfall Advances:** CGI was obligated to provide lease shortfall payments to Element on an ongoing basis. By the end of Q1'17, CGI had made $31.9m in payments to Element. These payments were capitalized (i.e. not expensed) on CGI balance sheet as "Lease Shortfall Advances" within Other Assets. In its Q1'17 10-Q, CGI noted that Element was obligated to reimburse it for these payments:

"The financing provider is required to reimburse us for these advances and, accordingly, **we have accounted for the related receivable under other assets** on our consolidated balance sheet, in the amount of **$31.9 million** as of September 30, 2016, and June 30, 2016."

**CGI claims it collected its Lease Shortfall Advances from Element:** In its 8-K filed on 1/6/2017, CGI claimed its $31.9m lease shortfall receivable had been almost completely reimbursed by Element as part of the JV closing:

**Net Cash Received from the JV Closing**

| ($ millions) | Q2' 17 |
|---|---|
| Cash received – redemption | $4.6 |
| Cash received – receipt of deferred purchase price cash | $6.7 |
| Cash received – sale of Quality equipment | $50.0 |
| Cash received – reimbursement of Other Assets | $31.8 |
| Cash invested in JV at closing | ($35.3) |
| **Net cash received at closing** | **$57.8** |

Sources: CGI filings with the SEC

**As disclosed in the subscription agreement, Element loaned money to CGI:** We believe the JV subscription agreement indicates that no collection occurred. Specifically, the subscription agreement details that Element provides a $31.8m "daylight loan" to the JV (i.e. "the Company" below), and then the JV would give the $31.8m received from Element to CGI.

> *At the closing of the Element Investment,*
>
> *((i)) Element shall transfer, convey, and assign to the Company the Element Assets;*
>
> *(ii) Element shall make a loan to the Company in the principal amount of $31,800,000 (the "Element daylight loan"), which shall be evidenced by this Agreement, and the Company shall pay $31,800,000 to Celadon in respect of the Payment; (Subscription Agreement, 02/10/17)*

**As also disclosed in the subscription agreement, CGI immediately paid back the loan to Element:** The subscription agreement further details that (1) CGI will transfer the cash to the JV (i.e. "the Company" below) and the JV would repay the loan from Element. Thus, CGI gave the cash it received from the daylight loan right back to Element at the JV closing. This, in our opinion, proves without a shadow of a doubt that CGI created a gimmick loan to fool investors into believing that it collected its outstanding Lease Shortfall Advances.

> *At the closing of the Celadon Investment,*
>
> *((i)) Celadon shall transfer, sell, and assign all of its interests in the Quality Assets to the Company;*
>
> *(ii) Celadon shall transfer $31,800,000 in cash to an account designated by the Company, and the Company shall repay the Element Daylight Loan in full; (Subscription Agreement, 02/10/17)*

44.    On this news, Celadon's share price fell $0.85, or 13.6%, to close at $5.40 on April 5, 2017.

45.    On April 19, 2017, *Prescience Point Research Group* published another report entitled "FOIA Requests Reveal CGI as the Subject of an Active SEC Investigation," which reported that the research group was denied information about Celadon sought under the FOIA due to an ongoing SEC investigation.  The report stated, in relevant part:

**<u>CGI is Being Investigated by the SEC Enforcement Division</u>**

We received data in response to our Freedom of Information Act ("FOIA") requests that confirms CGI is the subject of an active SEC investigation. CGI has failed to disclose these proceedings.

In a letter dated March 3, 2017, the FOIA office denied our request for access to CGI's investigative records by invoking Exemption (b)(7)(A) of the FOIA. Citation of the (b)(7)(A) exemption means that the SEC deems the release of information it has collected on CGI could be expected to interfere with law enforcement proceedings.

- An excerpt from the first page of the FOIA office's response letter is provided below:



- Again, by invoking Exemption (b)(7)(A), the SEC has acknowledged that CGI is the subject of an ongoing SEC investigation. Per the Department of Justice,

> *The first subpart of Exemption 7 of the Freedom of Information Act,*
> *Exemption 7, authorizes the withholding of 'records or information*
> *compiled for law enforcement purposes,* <u>*but only to the extent that*</u>
> <u>*production of such law enforcement records or information . . . could*</u>
> <u>*reasonably be expected to interfere with enforcement proceedings.'*</u>

- For further confirmation of the existence of an investigation, we sent an administrative appeal to the General Counsel's office. In its response, the General Counsel's office denied our access to CGI's records by once again invoking Exemption (b)(7)(A), stating that releasing investigative records on CGI could "interfere with ongoing enforcement proceedings." By doing so, the General Counsel's office has confirmed that CGI is the subject of an active SEC investigation. An excerpt from the first page of the General Counsel's response letter is provided below:



46.   On this news, Celadon's share price fell $0.20 or 4.55%, to close at $4.20 on April 19, 2017.

47.   On May 1, 2017, post-market, Celadon issued a Current Report filed on Form 8-K in the SEC, stating that "the Company's financial statements for the fiscal year ended June 30, 2016 and quarters ended September 30 and December 31, 2016, and related reports of [Celadon's auditor], should not be relied upon."  The Current Report, stated in relevant part:

**Item 4.02 Non-Reliance on Previously Issued Statements or a Related Audit Report or Completed Interim Review.**

(a) and (b)  *On April 25, 2017, BKD, LLP ("BKD"), the independent auditors for the Company, informed the chair of the Audit Committee of the Company's Board of Directors (the "Audit Committee") that it was withdrawing its reports on the June 30, 2016, September 30, 2016, and December 31, 2016 financial statements of the Company, and that those reports should no longer be relied upon.*  BKD advised the Company that additional information relating to transactions involving revenue equipment held for sale had come to BKD's attention subsequent to BKD's issuance of its audit report on the Company's June 30, 2016 financial statements and after the issuance of BKD's review reports on the Company's September 30, 2016 and December 31, 2016 interim financial statements.  BKD further advised the Company that, in accordance with PCAOB Auditing Standard 2905, BKD had performed procedures to evaluate this information, including requesting explanations and supporting documentation from the Company's management.  Based on the results of BKD's procedures, BKD advised the Company that BKD has been unable to obtain sufficient appropriate audit evidence to provide a reasonable basis to support its previously issued reports for the periods indicated above.  *As a result, as of May 1, 2017, the Audit Committee has concluded that the Company's financial statements for the fiscal year ended June 30, 2016 and quarters ended September 30 and December 31, 2016, and related reports of BKD, should not be relied upon.*

The Audit Committee has discussed with BKD the matters disclosed under this Item 4.02. Based on these discussions, the Company understands the following: (i) BKD has not resigned as the Company's auditor; (ii) BKD has determined that it has not obtained sufficient appropriate audit evidence with respect to the revenue equipment held for sale transactions to determine that those transactions were properly recorded in accordance with GAAP; and (iii) BKD is prepared to review additional information, if any, and adjustments to the Company's financial statements, if any, and to then consider whether to re-issue the withdrawn reports.

*The insufficient appropriate audit evidence relates to the accounting (and related structure, substance, and disclosure) of transactions involving dispositions and acquisitions of revenue equipment between June and December of 2016 and the related carrying values.*  Additional information concerning the transactions and the fair values of the revenue equipment disposed of and acquired is required to determine the appropriateness of the accounting for these transactions.   The need for additional information followed an Audit Committee request of BKD to perform additional procedures on the transactions prior to the normal audit cycle for fiscal 2017.

The Company has provided BKD a copy of this Form 8-K and requested BKD to furnish a letter addressed to the Securities and Exchange Commission stating whether it agrees with the statements made in Item 4.02 of this Form 8-K, and, if not, stating the respects in which it does not agree.  The Company has requested

that BKD provide such letter as soon as possible, so that the Company can file
such letter as an Exhibit to this Current Report on an amended Form 8-K within
the time period prescribed by the Securities and Exchange Commission.

(Emphasis added.)

48.     On this news, Celadon's share price fell $2.20, or 55%, to close at $1.80 on May

2, 2017.

49.     As a result of Defendants' wrongful acts and omissions, and the precipitous

decline in the market value of the Company's securities, Plaintiff and other Class members have

suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

50.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired Celadon securities during the Class Period (the "Class"); and were damaged

upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants

herein, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in

which Defendants have or had a controlling interest.

51.     The members of the Class are so numerous that joinder of all members is

impracticable.  Throughout the Class Period, Celadon securities were actively traded on the

NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can

be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or

thousands of members in the proposed Class.  Record owners and other members of the Class

may be identified from records maintained by Celadon or its transfer agent and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily used

in securities class actions.

24

52.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

53.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

54.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Celadon;

- whether the Individual Defendants caused Celadon to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Celadon securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

55.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

56.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Celadon securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Celadon securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

57.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

58.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

59.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

61.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Celadon securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Celadon securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

62.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Celadon securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Celadon's finances and business prospects.

63.    By virtue of their positions at Celadon, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

64.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Celadon, the Individual Defendants had knowledge of the details of Celadon's internal affairs.

65.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Celadon.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Celadon's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements,

the market price of Celadon securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Celadon's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Celadon securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

66.    During the Class Period, Celadon securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Celadon securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Celadon securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Celadon securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

67.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

68.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

69.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

70.    During the Class Period, the Individual Defendants participated in the operation and management of Celadon, and conducted and participated, directly and indirectly, in the conduct of Celadon's business affairs.  Because of their senior positions, they knew the adverse non-public information about Celadon's misstatement of income and expenses and false financial statements.

71.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Celadon's financial condition and results of operations, and to correct promptly any public statements issued by Celadon which had become materially false or misleading.

72.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Celadon disseminated in the marketplace during the Class Period concerning Celadon's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Celadon to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Celadon within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they

participated in the unlawful conduct alleged which artificially inflated the market price of Celadon securities.

73.    Each of the Individual Defendants, therefore, acted as a controlling person of Celadon.  By reason of their senior management positions and/or being directors of Celadon, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Celadon to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Celadon and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

74.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Celadon.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: May 19, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*

Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
Email:  peretz@bgandg.com

*Attorneys for Plaintiff*